[S. F. No. 1999.    In Bank.—July 28, 1900.]

JOSEPH BRITTON, Appellant, v. BOARD OF ELECTION COMMISSIONERS OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

CONSTITUTIONAL LAW—PRIMARY ELECTIONS.—The additions made to the Political Code by the act approved March 3, 1899 (Stats. 1899, p. 47), constituting what is known as the "primary election law," are in violation of the bill of rights embodied in article I of the constitution of California, and of fundamental reserved rights growing out of the nature of free government, in that they prohibit the election of delegates to a convention of any political party not representing three per cent of the votes cast at the last election, and take away the rights of self-control and self-preservation from a political party, and allow members of any other party, or of no party, to vote for delegates to the party convention.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Myrick & Deering, and L. A. Gibbons, for Appellant.
CXXIX. CAL.—22

The primary law is mandatory in its terms, and is violative of section 11 of article I of the constitution, and of subdivision 33 of section 25 of article IV, in that it does not have a uniform operation upon all political parties, and is special legislation in that regard. (*Fields v. Osborne,* 60 Conn. 544; 12 L. R. A. 552; *Eaton v. Brown,* 96 Cal. 375.[1]) It deprives electors of their party choice of delegates, and to impair their right to vote their choice thus is to take away the substance of their rights. (*Spier v. Baker,* 120 Cal. 370; *Sanner v. Patton,* 155 Ill. 564; *Page v. Allen,* 58 Pa. St. 338[2]; *Moore v. Collins,* 17 Ohio St. 665; *State v. Dillon,* 32 Fla. 579; *Attorney General v. Detroit,* 78 Mich. 545[3]; *Dells v. Kennedy,* 49 Wis. 555[4]; *Daggett v. Hudson,* 43 Ohio St. 568.) It deprives illiterate voters of their constitutional right to a secret ballot. (Const., art. II, sec. 5; Cooley's Constitutional Limitations, 761; McCrary on Elections, sec. 453; *People v. Cicott,* 16 Mich. 285,[5] per Campbell, J.; *Temple v. Mead,* 4 Vt. 535; *Druliner v. State,* 29 Ind. 308; *Fletcher v. Wall,* 172 Ill. 426; *Williams v. Stein,* 38 Ind. 89[6]; *Ritchie v. Richards,* 14 Utah, 375.) The law violates the bill of rights and the reserved rights of the people belonging to a political party to control and govern their own political party and their own primary election of delegates. (Const., art. I, secs. 1, 11, 23; 10 Am. & Eng. Ency. of Law, 2d ed., p. 643; *People v. Cavanaugh,* 112 Cal. 675; *State v. Johnson* (Mont., Oct. 22, 1896), 46 Pac. Rep. 534.)

W. B. Treadwell, *Amicus Curiae,* also for Appellant.

The nature of free government is an implied limitation on the power of the legislature. (Cooley's Constitutional Limitations, secs. 174-76; *Calder v. Bull,* 3 Dall. 386; *Loan Association v. Topeka,* 20 Wall. 655, 662, 663; *Durkee v. Janesville,* 28 Wis. 467[7]; *People v. Salem,* 20 Mich. 452.) Self-preservation is an inherent right of political parties, as well as of individuals. (*Whipple v. Broad,* 25 Colo. 407, per Mr. Justice Goddard.)

[1] 31 Am. St. Rep. 225.
[2] 98 Am. Dec. 272.
[3] 18 Am. St. Rep. 458.
[4] 35 Am. Rep. 786.
[5] 97 Am. Dec. 141.
[6] 10 Am. Rep. 97.
[7] 9 Am. Rep. 500.

Franklin K. Lane, City and County Attorney, M. M. Estee, and Gavin McNab, for Respondents.

The primary election law is no more obnoxious to the constitution than section 1186 of the Political Code, which has been upheld, except as to the matter of voting a straight ticket. (*Eaton v. Brown*, 96 Cal. 371.[8]) The three per cent limitation is only a reasonable limitation, such as various courts have upheld. (McCrary on Elections, sec. 689; *De Walt v. Bartley*, 146 Pa. St. 543[9]; *State ex rel. Lewis v. Kinney*, 57 Ohio St. 221; *In re Continue*, 14 Misc. Rep. 139; *Corcoran v. Bennett*, 20 R. I. 6; *Miner v. Olin*, 159 Mass. 489.) It does not appear that the plaintiff is without a party. The primary election law does not interfere with the rights of voters or of political parties. A voter may ally himself with any political party he chooses, but cannot vote for more than one party, as all voters of all parties must vote the same day and cannot vote but once. The law is rather a protection against the possibility or reasonable probability of the voters of one party interfering with the primaries of another, and thus disfranchising themselves in their own party. Double fraudulent voting in the primaries of opposite parties, which has heretofore taken place, is prevented by the law. All doubts must be resolved in favor of the law. (*Stockton etc. R. R. Co. v. Stockton*, 41 Cal. 147; *University of California v. Bernard*, 57 Cal. 613; *People v. Hayne*, 83 Cal. 111[10]; *Matter of Bonds of Madera Irr. Dist.*, 92 Cal. 296.[11]) The court is not called upon to imagine a possible contingency in which its provisions may conflict with the constitution. (*Woodward v. Fruitvale Sanitary Dist.*, 99 Cal. 554.) The primary law adopts the safeguards of the general law, and is promotive of honest primary elections. A court of equity has no right to interfere by injunction with the conduct of a public election. (*Harris v. Schryock*, 82 Ill. 119; 2 High on Injunctions, 2d ed., sec. 1250.)

T. C. Spelling, *Amicus Curiae*, also for Respondents.

HENSHAW, J.—By an act approved March 3, 1899 (Stats. 1899, p. 47), the legislature added certain sections to the Politi-

[8] 31 Am. St. Rep. 225.
[9] 28 Am. St. Rep. 814.
[10] 17 Am. St. Rep. 217.
[11] 27 Am. St. Rep. 106.

cal Code, providing thereby an exclusive scheme controlling
political parties in holding their conventions for the nomination
of candidates to public office. The act is known as the primary
election law, and for convenience may be so designated. Plain-
tiff, a resident and taxpayer of the city and county of San Fran-
cisco, by his complaint sought an injunction against the defend-
ants, constituting the board of election commissioners of
San Francisco, to restrain them from expending the public
moneys of the city and county under the terms of this law,
alleging it to be unconstitutional and void. Defendants' gen-
eral demurrer to the complaint was sustained, and plaintiff,
declining to amend, appeals from the judgment against him
which followed.

Conventions of political parties, consisting of representatives
of the voters of such parties, assembled to deliberate and place
in nomination their candidates for various public offices, have
long been known in the history of this country. Heretofore the
methods which political parties might adopt for the selection
of delegates to such nominating conventions have usually been
left to party organization, and the legislature has contented
itself, when it has seen fit to act at all, with conservative, tenta-
tive, and permissive acts, such as found expression in the earlier
primary law of this state, popularly called the Porter primary
law. (Stats. 1865-66, p. 438.)

In 1897 the legislature made its first essay in mandatory and
compulsory legislation touching the holding of primary elec-
tions. (Stats. 1897, p. 115.) That law was declared unconsti-
tutional as imposing limitations and conditions upon the right
of suffrage other than such as were named in the constitution
itself, and grave doubt was expressed as to the power of the
legislature to prescribe a voting test and impose it upon political
parties and their members as a prerequisite to their right to
participate in party affairs. (*Spier v. Baker*, 120 Cal. 370.)

In the present law the legislature has omitted certain obnox-
ious features found in the earlier act, but has introduced others
which go to the essence of the legislation, and which we are
earnestly told in argument are violative of the constitutional
rights of the people, both express and implied.

That a compulsory primary law, such as this, forms a part

of the general election laws of the state is not, we think, debatable, and has been distinctly decided.  (*Spier v. Baker, supra.*)

At the outset the law declares that all delegates to conventions of political parties for the purpose of making nominations of candidates for public offices shall be elected at elections conducted under the regulations in the act provided.  There is at once to be perceived an express limitation upon the powers of political parties, which heretofore they have exercised, of adopting their own modes for the selection of their representatives.  It is a part of the political history of this state and of the United States that such powers, whether resting in right or merely in the permissive silence of the legislature, have been freely enjoyed.  In some instances political parties have had recourse to primary elections under such regulations and tests as the executive managers of the party might prescribe.  In others, resort is had to the organization of precinct or district political clubs with an enrolled membership, the members thus duly entered having alone  the right to select delegates to the nominating conventions.

· We will not now stop  to consider whether  political parties have heretofore enjoyed these privileges as of right or merely under permission.  We have referred to the matter only as illustrating the bold innovation of this legislation,  and thus of an added necessity for a careful scrutiny and consideration of its terms.  This much, however, we think will be freely conceded by advocate as well as by antagonist of the law, that if the legislature takes unto itself the regulation and control of these internal affairs of political parties, it must do so without discrimination and with equal consideration and benefit to all.  With the wisdom or the policy of the law this court, of course, can have nothing to do, but, if the law be wise and beneficent, every organized political party must come under its cloak.  If, upon the other hand, the law be unwise or inexpedient, none the less every political party must equally suffer the burden and bear the consequences.

But here we are confronted with a provision in this law denying its rights and privileges to all political parties which did

not cast at the next preceding election at least three per cent of the total vote.   In other words, no matter how well organized a small political party may be, no matter how devoted its adherents may be to its tenets, they are denied a representation upon the primary ballot, cut off from all benefits of the law, prohibited from holding a nominating convention (because only under the provisions of this law can such a convention be held), and are thus absolutely debarred from the privileges and protection accorded to other political parties.   This is not the case where the state, as matter of regulation when called upon to print ballots at public expense, restricts the names to be printed thereon to the parties polling a certain percentage of the votes. Even upon this question there has been a division in the courts, some holding it to be a mere matter of regulation and not an interference with the right of suffrage, and others maintaining that it confers a special privilege upon the stronger of the political parties.   But where such laws have been upheld, the right of the voter freely to express his preference has always been preserved, as in this state, by blank spaces wherein he may write the names of the candidates of his choice.   This law contains no such provision.   Minor political parties are denied any right of representation upon the ballot, and are in effect forbidden to hold political conventions under the protection of the law.   It is no answer to this to say that they may still cause the names of their nominees to be placed upon the election ballot by petition.   The objection is not that they may not in some way preserve this important right, but that they are denied the means to accomplish this result by the holding of a convention, that they are denied the right freely to assemble under the protection of the law—a right preserved to them both by the constitution of the United States and of the state of California— while other political parties no differently situated, saving that they are numerically stronger, are given this right and protected by all of the machinery of the law in its exercise.   Political conventions are, after all, but public assemblages of the people, having for their end the discussion of ways and means for the public good.   By the declaration of rights of the constitution of this state the people have the right to assemble freely to con-

sult for the common good, to instruct their representatives and to petition the legislature for redress of grievances. (Const., art. I, sec. 10.)   No citizen or class of citizens shall be granted privileges or immunities which upon the same terms shall not be granted to all citizens (Const., art. I, sec. 21), and all laws of a general nature shall have a uniform operation. (Const., art. I, sec. 11.)   How can it be said that a law which protects by legislation a certain number of citizens forming one political party, and deprives a fewer number of citizens forming another political party of the same protection, is not violative of these provisions?   Or how shall it be said that a man belonging to a party holding certain political principles may not participate in a primary election, when his neighbor of different political faith is accorded the right so to do?

The case in this regard is identical in principle with the views expressed by Mr. Justice Garoutte in his concurring opinion in *Eaton v. Brown,* 96 Cal. 371, where he says: "It is very apparent from the reading of the act that in both spirit and letter it was intended that only parties polling three per cent of the entire vote cast at the last general election should have a heading upon the ticket.   Such being the fact, to my mind the law is clearly unconstitutional."

Moreover, if the legislature may deny the protection of its laws to a political party which has cast less than three per cent of the votes, why may it not deny the same right to a party which has cast forty-nine per cent of the votes?   This is not a mere matter of regulation, as in the case of the election ballot. It is the deprivation of the one party and the conferring upon another of certain important political privileges, and answer to it cannot be made by saying that the three per cent limit is reasonable, while a forty-nine per cent limitation would be unreasonable.   It is a question of power.   Either the legislature has or has not the constitutional power so to do.   If it has the power, the question of reasonableness or unreasonableness is for the legislature alone, and a court would no more be justified in overthrowing the law because it believed a forty-nine per cent limitation to be unreasonable than, in the absence of such power, it would be warranted in upholding a three per cent limitation

because it might believe it to be reasonable. And upon this we think that under the express limitations upon the power of the legislature in the sections of the constitution above adverted to, the legislature has not such power; for the effect of its act here under consideration is not only to discriminate between political parties and the members thereof, but absolutely to work the disfranchisement of voters, or to compel them, if they vote at all, to vote for representatives of political parties other than that to which they belong. The deprivation of the right of selection is a deprivation of the right of franchise.

It is further contended against this law that in its present state it works an unwarranted invasion of the rights of political parties, and this contention merits more than a passing notice. No one can be so ignorant as not to appreciate the value, indeed, the necessity, of opposing political parties in a government such as ours. No one, it would seem, can be so thoughtless as not to realize that government by the people is a progressive institution which seeks to give expression and effect to the wisest and best ideas of its members. No statement is needed in the declaration of rights to the effect that electors holding certain political principles in common may freely assemble, organize themselves into a political party, and use all legitimate means to carry their principles of government into active operation through the suffrages of their fellows. Such a right is fundamental. It is inherent in the very form and substance of our government, and needs no expression in its constitution. Says Judge Cooley, in discussing this general subject (Cooley's Constitutional Limitations, 174): "It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed. Prohibitions are only important when they are in the nature of exceptions to a general grant of power; and if the authority to do an act has not been granted by the sovereign to its representatives, it cannot be necessary to prohibit its being done. . . . . The right of local self-government cannot be taken away, because all our constitutions assume its continuance as the undoubted right of the people, and as an inseparable incident to republican government.

The bills of rights in the American constitutions forbid that parties shall be deprived of property except by the law of the land; but if the prohibition had been omitted, a legislative enactment to pass one man's property over to another would nevertheless be void. . . . . There is no difficulty in saying that any such act, which under pretense of exercising one power is usurping another, is opposed to the constitution and void. It is assuming a power which the people, if they have not granted it at all, have reserved to themselves."

As early as 1798 the supreme court of the United States, speaking through Mr. Justice Chase, in *Calder v. Bull*, 3 Dall. 386, said: "I cannot subscribe to the omnipotence of a state legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the constitution or fundamental law of the state. The people of the United States erected their constitutions, or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and terms of the social compact; and, as they are the foundation of the legislative power, they will decide what are the proper objects of it. The nature and ends of legislative power will limit the exercise of it. This fundamental principle flows from the very nature of our free republican governments, that no man should be compelled to do what the laws do not require, nor to refrain from acts which the laws permit. There are acts which the federal or state legislature cannot do without exceeding their authority. There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power—as to authorize manifest injustice by positive law, or to take away that security for personal liberty or private property, for the protection whereof the government is established. An act of the legislature (for I cannot call it a law) contrary to the great first principles of the social compact cannot be considered a rightful exercise of legislative authority." And in *Loan Assn. v. Topeka*, 20 Wall. 655, that same tribunal declared: "It must be conceded that there are such rights in

every free government beyond the control of the state. . . . .
There are limitations on such power which grow out of the essential nature of all free governments—implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name."

Active political parties, parties in opposition to the dominant political party, are, as has been said, essential to the very existence of our government. The right of any number of men holding common political beliefs or governmental principles to advocate their views through party organization cannot be denied. As has been said: "Self-preservation is an inherent right of political parties, as well as of individuals." (*Whipple v. Broad*, 25 Colo. 407.) A law which will destroy such party organization, or permit it fraudulently to pass into the hands of its political enemies, cannot be upheld. The procedure of political parties may be regulated, and the wisdom of the legislature may well be exercised in devising methods to check political corruption and fraud, but the legislature itself, under the guise of regulation, cannot be permitted to throw open the doors to these very abuses. A law authorizing or even permitting the opponents of an organized political party to name the delegates to the nominating convention of that party would not for a moment be countenanced. Yet that in effect is precisely what the act under consideration does permit. It provides that the primary elections of all political parties shall be held at the same time. To the intending voter at such primary one ticket is given. No question may be permitted touching his political affiliations, past, present, or future. The voter takes the ticket, retires into the privacy of the booth, and there, secretly—and not in violation of any law, but in strict accordance with the law—names such delegates as he desires to the political convention of one or another of the parties, whether he is a member of that party or not, whether he ever intends to become such a member or not. The result is apparent. The control of the party and of its affairs, the promulgation and advocacy of its principles, are taken from the hands of its honest members and turned over to the venal and corrupt of other political parties,

or of none at all.  Masquerading thus under the name of one of the great political parties might be a convention of men authorized by this law to represent it and place upon the general election ballot as its candidates those whom they might select —a body of men whose sole purpose might be the disruption and destruction of the party whose representatives this law declared them to be.  It is expressly announced in the declaration of rights that the enumeration therein contained shall not be construed to impair or deny other rights retained by the people.  (Const., art. I, sec. 23.)  A law which thus permits the disruption and misrepresentation of a political party is an innovation of these reserved rights.  For the foregoing reasons the judgment of the trial court is reversed, with directions that it overrule the demurrer of defendants.

Van Dyke, J., and McFarland, J., concurred.

Beatty, C. J., dissented.

TEMPLE, J., concurring.—I concur in the judgment on the second ground discussed by Mr. Justice Henshaw, and for the following additional reasons:

The act itself recognizes the necessity of political parties, and they are in fact the instrumentalities through which the people govern.  A political party is an association of citizens who agree on certain lines of policy; and the purpose for which it exists is to impose that policy upon the government.  This can only be done by electing to office those who are in favor of such policy.  It is for this that conventions are held and candidates selected.  To do this it is absolutely necessary that the party shall be able to exclude from its conventions, and from controlling positions in the party, those who are not in accord with its principles.  It must have the power to prescribe its own tests.  It is the test that determines what the party shall be.  To deprive the party of this power is to destroy it.  No one would contend that the legislature can prescribe what the test shall be.  If it could do this it could prescribe what parties shall exist.  And then, parties sometimes divide on great public questions.  In such case the party retaining the old name would have the right, by proper tests, to exclude those formerly

affiliated with it, but who now differ. Unless a party can do all these things it has no security that the candidates put forth in its name represent its principles. And then the management and control of its organization may be taken out of its hands and given to its enemies. All this right of self-control the primary election law takes from the party organization. The party is destroyed, or may be, and the members practically denied the right of free suffrage.

And then there may happen to be a new party which did not exist at the previous election. Why should it, or, indeed, other political parties polling less than three per cent of the votes, be denied the benefit of the protection of this law—if it be a protection?

Harrison, J., concurred in the above opinion.

GAROUTTE, J., dissenting.—I dissent. In the Australian ballot law a declaration is found defining what constitutes a political party within the purview of the act; and then it is further declared that those parties are entitled to hold political conventions and nominate candidates for office. The vital element going to make up a political party under that act is that it shall have polled three per cent of the entire vote cast at the last election. The primary law does not attempt to define the phrase "political parties," but declares that only those political parties which polled three per cent of the total vote cast at the last election shall participate in primary elections. In other words, this is a declaration that only those political parties which are entitled to hold conventions and nominate candidates for office under the Australian ballot law are entitled to hold primary elections. It is thus apparent that the primary law refers to a great class of political parties. And if the political parties declared and recognized by the Australian ballot law form a constitutional class, then the primary law in dealing with that class of political parties is likewise constitutional. While the question has never been decided in this state, it has been decided in other states, and held, that a classification of parties upon the basis of a certain percentage of the total vote cast at the last election is not violative of constitutional provisions. Indeed,

it seems to me that the declaration of the state legislature found in the Australian ballot law as to what shall constitute a political party within the meaning of that act is constitutional legis-·lation.   For these reasons I do not deem the three per cent clause of the primary election law obnoxious to the constitution of this state.   It may be further suggested that as the Australian ballot law does not recognize an organization as a party, which failed to poll three per cent of the total vote cast at the last election, no substantial benefits could be derived by such a party in participating in primary elections; for the nominees of a convention composed of delegates selected at the primary election by such party would not be entitled to a place upon the ballot.   It must be borne in mind always that the primary law in this regard is not dealing with voters as individuals, but with political parties as such.   If the declaration found in the present Australian ballot law, defining what shall constitute a political party, had been in that law at the time *Eaton v. Brown,* 96 Cal. 371, was decided, I am not prepared to say that my views as there expressed would have been the same.

It may be further suggested that under the present law, the ballot being entirely secret, and every voter being allowed to cast his vote for the delegates of any party represented upon the ballot, the result is that Democratic voters may elect delegates to Republican conventions, and Republican voters may elect delegates to Democratic conventions, and thereby absolutely own and control the conventions of opposing political parties. I am not prepared to say that the existence of these conditions clearly renders a law unconstitutional which permits it.   But I am prepared to say that a law of that character presents a most anomalous state of affairs.